UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LARRY E. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04531-JRS-DLP |
| | ) | |
| PROCTER & GAMBLE, | ) | |
| PROCTER & GAMBLE U.S. BUSINESS | ) | |
| SERVICES COMPANY, | ) | |
| PROCTER & GAMBLE DISTRIBUTING | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motion for Summary Judgment**

On April 14, 2017, Plaintiff Larry Anderson discovered a burn on his right foot, which he claims was caused by an individual, partially dissolved, packet of Tide PODS ("PODS") inside his sock.  On July 18, 2019, Anderson brought suit in the Brown County Circuit Court, Brown County, Indiana, against Defendants Procter & Gamble, Procter & Gamble U.S. Business Services Company, and Procter & Gamble Distributing LLC (collectively, "P&G"), the manufacturer of PODS, alleging P&G is liable for defective design and failure to provide adequate warnings under the Indiana Product Liability Act ("IPLA"), Ind. Code § 34-20-1-1 *et seq*.  On November 12, 2019, P&G removed the action to this Court pursuant to diversity jurisdiction. P&G now moves for summary judgment, (ECF No. 51), asserting that Anderson cannot establish the essential elements of his claims.  For the following reasons, P&G's motion is **granted**.

1

## I.   Background

PODS are a single-unit dose packet of liquid laundry detergent, sold as individual packets ("pacs") in a plastic container or bag.  (Vasunia Aff. ¶¶ 4–5, ECF No. 51-3 at 2.)  To do a load of laundry correctly using PODS, a consumer places a single pac into the washing machine prior to placing the items to be washed in the washing machine. (*Id.* ¶ 5, ECF No. 51-3 at 2.)  Once the washing machine starts and fills with water, the outer film of the pac dissolves in the water and releases the detergent into the wash.  (*Id.*)  P&G provides specific instructions and warnings on the PODS packaging for consumers to follow in the use of the product and in the event of skin exposure. (*Id.* ¶ 17, ECF No. 51-3 at 6.)

The PODS product packaging contains the instruction:

ADD PACS TO DRUM BEFORE CLOTHES

(*Id.*)  This instruction appears conspicuously in all capital letters because it is important: putting the pac in first allows water to reach the pac more directly and more quickly, which facilitates dissolution.  (*Id.*)  The PODS product packaging also contains the following instruction:

> FIRST AID TREATMENT: Contains nonionic and anionic surfactants, ethoxylated polyethylene polyamine (polymer) and enzymes.   If swallowed, or if detergent gets in mouth or on *skin*, call your local Poison Control Center (or in US: 1-800-222-1222) or doctor immediately. Immediately and thoroughly rinse eye or *skin* with water for 15 minutes. If swallowed, give a glass of water or milk.  Do not induce vomiting.

(*Id.* ¶ 18 (emphasis added).)

Since PODS were first introduced, Anderson and his wife, Connie Anderson, have used PODS.  (Anderson Dep. 11:4–6, ECF No. 51-4 at 4.)  Mr. and Mrs. Anderson read

the PODS instructions when they first started using PODS.  (Anderson Dep. 17:1–13, ECF No. 51-4 at 5; Mrs. Anderson Dep. 23:13–25, ECF No. 51-5 at 3.)  However, after reading them, Anderson only reviewed the instructions a few more times throughout the years to refresh his memory.  (Anderson Dep. 17:15–19, ECF No. 51-4 at 5.)  Despite reading the instructions, Anderson would not place a PODS pac in the washer before placing his clothes in the washer; instead, he would first place his laundry in the washer and add a PODS pac afterward.  (Anderson Dep. 12:8–12; 25:19–24, ECF No. 51-4 at 4, 7.)  When Mrs. Anderson did laundry, she would sometimes add fabric softener to the load, which was blue in color, or use dryer sheets. (Mrs. Anderson Dep. 26:14–16, 46:9–11, ECF No. 51-5 at 4, 8.)  In August of 2017, Anderson and his wife shared laundry duties.  (Anderson Dep. 10:18–19, ECF No. 51-4 at 4.)  However, Anderson does not recall who did the load of laundry immediately prior to August 14, 2017.  (Anderson Dep. 21:5–11, ECF No. 51-4 at 6.)

On August 14, 2017, Anderson woke up early and got ready to head to his job at Kramer Furniture and Cabinet Makers in Edinburgh, Indiana.  (Anderson Dep. 8:17, 20:11, ECF No. 51-4 at 3, 6.)  That morning, he put on a pair of white work socks. (Anderson Dep. 20:15–16, 21:3–4, 51:3–21, ECF No. 51-4 at 6, 14.)  He did not pay particular attention to his socks.  (Anderson Dep. 51:8–12, ECF No. 51-4 at 14.)  He put on a pair of relatively new steel-toed boots that he had owned for about a week; "just a few days before the incident," his employer had started to require employees to wear steel-toed boots rather than tennis shoes, which Anderson had previously worn during the summer.  (Anderson Dep. 43:2–18, ECF No. 51-4 at 12.)  The boots

3

were not particularly comfortable and did not "breathe well."  (Anderson Dep. 43:18, 43:25, ECF No. 51-4 at 12.)

Anderson arrived at work in time for his 6:00 a.m. shift.  (Anderson Dep. 42:20, ECF No. 51-4 at 12.)  August 14 was a warm day; the temperature rose to the "mid 80s," and Anderson had a busy day working on cabinetry, which required him to be on his feet for most, if not the entire, day.  (Anderson Dep. 42:25, 44:6–7, 46:25, 47:6, 48:5–9, ECF No. 51-4 at 12, 13.)  Anderson had no pain in his foot at first, but as the workday went on and the temperature increased in the shop, his right foot began to itch.  (Anderson Dep. 43:20–23, ECF No. 51-4 at 12.)  At the time, Anderson attributed his discomfort to his steel-toed boots.  (Anderson Dep. 43:24–25, 44:10–11, ECF No. 51-4 at 12.)  Anderson also had sensations in his feet that day due to his Type II diabetes.  (Mrs. Anderson Dep. 37:7–23, 38:2–7, ECF No. 51-5 at 5, 6; *cf.* Anderson Dep. 70:13–18, ECF No. 51-4 at 18.)  Unfortunately, although he wanted to remove his boot to let his foot air out, he did not have the time to do so.  (Anderson Dep. 44:15–18, ECF No. 51-4 at 12.)

After completing his ten-hour shift, Anderson drove home.  (Anderson Dep. 44:23, 48:22, ECF No. 51-4 at 12, 13.)  Once he arrived home, he removed his right boot and right sock and noticed that his foot "started to become kind of like really irritated and red looking."  (Anderson Dep. 45:20–21, ECF No. 51-4 at 12.)  He also noticed an oval-shaped blue stain on the top of his right sock, which was about three inches in diameter and smelled like laundry detergent.  (Anderson Dep. 46:4–6, 50:11–18, 53:21–23, ECF No. 51-4 at 13, 14.)  Mrs. Anderson witnessed Anderson's injury but

4

does not recall what the sock looked like or whether the sock had a blue stain on it. (Anderson Dep. 67:2–4, ECF No. 51-4 at 17; Mrs. Anderson Dep. 39:10–21, 42:24–43:5, ECF No. 51-5 at 6, 7.)

The next day, Anderson went to the doctor to treat his foot injury, which he was told was a chemical burn. (Anderson Dep. 55:9–18, ECF No. 51-4 at 15.) In the days that followed, his wound blistered and eventually turned into an open sore; he followed up with his doctor several times to continue treatment. (*Id.*)

Anderson does not recall when the right sock had been last washed before he wore it on August 14, 2017. (Anderson Dep. 21:14–16; 39:24–40:13, ECF No. 51-4 at 6, 11.) Moreover, after the incident, Mrs. Anderson washed the work clothes Anderson wore on August 14, 2017—including the right sock. (Anderson, 52:21–24, ECF No. 51-4 at 14.) Anderson no longer has the sock, nor the washing machine. (Anderson Dep. 22:17–23:7, 52:19, ECF No. 51-4 at 7, 14.)

## II.   Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016)

5

(citing *Modrowski*, 712 F.3d at 1169).  If the movant discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  But the Court must also view the evidence "through the prism of the substantive evidentiary burden."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## III.    Discussion

As a preliminary matter, Anderson has abandoned his defective design claim under the IPLA by conceding that P&G did not violate Indiana Code § 34-20-2-1. (ECF No. 58 at 7 ("Plaintiff concedes, after completing discovery, that the Defendants did not violate [Indiana Code] § 34-20-2-1 . . . .").)  Therefore, the Court **grants** summary judgment as to Anderson's defective design claim.  *Cf. Mach v. Will Cnty. Sheriff*, 580 f.3d 495, 501 (7th Cir. 2009) ("A plaintiff may determine as a matter of strategy that a weak, yet non-frivolous, argument is no longer worth presenting so that he may focus the court's attention on his more meritorious claims.").

The Court now addresses whether summary judgment is warranted as to Anderson's remaining claim—failure to provide adequate warnings.  Anderson argues that P&G failed to provide two warnings on the PODS packaging: (1) "to inspect clothing after washing, but before wearing clothes"; and (2) "that failing to

6

inspect clothing after washing, but before wearing the clothes, could cause burns upon the skin."  (ECF No. 58 at 8.)  P&G argues, however, that Anderson has failed to establish an essential element of his claim and that summary judgment is therefore warranted in this case.

Because this case is premised on diversity jurisdiction, the Court turns to applicable Indiana substantive law to decide this issue.  The IPLA, "governs all claims brought by a consumer against a manufacturer for physical harm caused by its product, regardless of legal theory." *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1007 (7th Cir. 2020) (citing Ind. Code § 34-20-1-1).  "A plaintiff bringing an action under the [IPLA] must establish that (1) he or she was harmed by a product; (2) the product was sold 'in a defective condition unreasonably dangerous to any user or consumer'; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold." *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635 (7th Cir. 2006) (citing Ind. Code § 34-20-2-1).

Focusing on the second element, a product is "defective" for failure to provide adequate warnings if the seller fails to "(1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product . . . when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer." Ind. Code § 34-20-4-2.  Inadequate-warning claims sound in negligence. *Weigle v. SPX Corp.*, 729 F.3d 724, 731 (7th Cir. 2013).  To recover damages based on

7

an inadequate warning theory, "a plaintiff must prove that the defendant breached the duty of reasonable care owed to him . . . and the breach proximately caused his injury." *Kaiser*, 947 F.3d at 1008 (citing *Brewer v. PACCAR, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019)).

The Court will discuss only the breach element, as it is sufficient to decide the case.  Anderson argues that there is a factual dispute about the adequacy or lack of specific warnings in this case.  "[A] product may be defective under the [IPLA] where the manufacturer fails in its duty to warn of a danger or instruct on the proper use of the product as to which the average consumer would not be aware." *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007) (citing *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 281 (Ind. 1983)).  "This duty is twofold: (1) to provide adequate instructions for safe use and (2) to provide a warning as to dangers inherent in improper use." *Id.*  "The product label must make apparent the potential harmful consequences.  The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger." *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988).

A warning's adequacy is measured by its factual content, the manner in which it is expressed, and the method of conveying these facts. *Id.* at 1162–63.  "The adequacy of a warning (i.e., whether the defendant breached its duty to warn) is generally a question of fact, but it can be decided as a matter of law when the facts are undisputed and only one inference can be drawn from those facts." *Weigle*, 729 F.3d at 731  (citing *Cook v. Ford Motor Co.,* 913 N.E.2d 311, 327 (Ind. Ct. App. 2009)).

Anderson asserts that there is a genuine issue of material fact whether the lack of warnings was "reasonable under the circumstances." (ECF No. 58 at 12.) Anderson's argument is threefold. He argues (1) that he properly followed the instructions on the PODS packaging; (2) that the PODS packaging should have contained a warning that the liquid inside PODS could cause cell death; and (3) that P&G should have provided warnings that users should inspect clothes after washing them and that a failure to do so could cause a burn on the skin.

First, Anderson asserts that he did follow the instructions because they did not require preplacement of the pacs. But Anderson's assertion that the instructions do not require that pacs be placed into the washing machine before clothes is plainly contrary to the facts in the record. The instructions state: "ADD PACS TO DRUM BEFORE CLOTHES." (Vasunia Decl. ¶ 17, ECF No. 51-3 at 6.) This instruction is important because putting the pac in first facilitates proper dissolution of the pac. (*Id.*) Moreover, Anderson admitted to not following the instructions. (Anderson Dep. 12:8–12, 25:19–14, ECF No. 51-4 at 4, 7.) Instead, his habit was to put his clothes in the washer before adding a pac to the load. (*Id.* at 12:8–12, 25:19–14, ECF No. 51-4 at 4, 7.)

P&G argues that Anderson's admitted misuse of PODS bars his claim. In Indiana, it is the case that misuse of a product is "a complete defense, but it has to be proven." *Campbell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 956 (Ind. 2018). Misuse "means to use a product in a way in which it was not intended to be used." *Traylor v. Husqvarna Motor,* 988 F.2d 729, 734–35 (7th Cir.1993). "[T]he key to a

successful claim of misuse is whether the seller can prove that the misuse, *from the seller's perspective,* was not reasonably foreseeable. The foreseeability of an intervening misuse is usually a question for the jury." *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1342 (7th Cir. 1995). Here, although Anderson admitted to not following the instructions and thus misusing PODS, there is a genuine issue of material fact concerning P&G's expectation of Anderson's failure to correctly use PODS. Specifically, given that there are only so many ways to do laundry using PODS (e.g., preplacing the pac in the machine followed by clothes; placing some clothes in the machine, a pac, and then the remainder of the clothes; placing all clothes in the machine followed by a pac; or some combination in between), it is not clear from the record that P&G can prove from its perspective that Anderson's misuse was not reasonably foreseeable. This is a question best left to a jury.

Thus, the Court turns to Anderson's assertion that the PODS packaging failed to provide adequate warnings. In this regard, Anderson argues that PODS should have contained a warning that the surfactants and propylene glycol contained in PODS could cause cell death. He asserts, without further support, that P&G's lack of warning about cell death on PODS packaging "alone necessitate[d] a warning." (ECF No. 58 at 10.) Similarly, Anderson argues that P&G should have provided a warning that users should inspect clothes after washing them and that a failure to do so could cause a burn on the skin.

To support his arguments, Anderson relies on the testimony of Dr. Travers, one of P&G's retained experts. He highlights Dr. Travers's testimony that if someone were

to find residue from a PODS pac on his or her clothes, the clothes should be rinsed before wearing them.  Furthermore, he asserts that Dr. Travers testified as to what proper instructions or warnings were warranted.  But Anderson takes Dr. Travers's testimony out of context, according to P&G, which asks the Court to consider P&G's Supplemental Designation of Evidence, (ECF No. 59-1), designating additional testimony of Dr. Travers, (ECF No. 59-2), to provide the Court with the full context of his testimony.  Because Anderson provided a piecemeal version of Dr. Travers's testimony, (*see* ECF No. 58-3), the Court finds that it should consider P&G's supplement of Dr. Travers's additional testimony, (ECF No. 59-2), which was taken from the same deposition and merely fills in the missing gaps.  *Cf. Vance v. Ball State Univ.*, 646 F.3d 461, 468 (7th Cir. 2011).  P&G's request (ECF No. 59-1) is thus granted.

Taken in context, Dr. Travers's testimony belies the notion Dr. Travers provided a general prescription for what instructions or warnings were warranted.  While Dr. Travers did testify that a patient with residue from PODS on his clothes should rinse his clothes before wearing them, (Travers Dep. 47:12, ECF No. 59-2 at 8), this was in response to a hypothetical on how he would advise a specific patient rather than what warnings he would advise in general .  An excerpt from the Dr. Travers's deposition shows this:

> Mr. Phelps: As a dermatologist and toxicologist, and as an expert witness, I understand this is a hypothetical question . . . if you had a patient who had been burned by residue from the Tide Pod and you treated them, and they asked you how to prevent that type of burn, I'm assuming you would instruct them to inspect their clothes, make sure

all the detergent residue has been rinsed away before they wear the piece of clothing? Would that be fair?

Dr. Travers: That would be part of it.

Mr. Phelps: What would be the rest of it?

Dr. Travers: Well, to make sure they're using the product appropriately, common sense, because you don't know how people are using things in that hypothetical situation. You know, No. 1, make sure things are done by the manufacturer's – the way that you're supposed to be using them. The other thing I think would be important is obviously, I wouldn't see them right away. If – making sure that the area was washed, rinsed appropriately. And also, if you had noted any kind of discomfort in any part of your body, you should inspect it.

(Travers Dep. 46:24–47:25, ECF No. 59-2 at 8.)  The excerpt makes clear that Dr. Travers was simply responding to a hypothetical question about a hypothetical patient—not opining about the general warnings he believes should be required on PODS.

Also, contrary to Anderson's assertion that Dr. Travers testified as to the adequacy of P&G's warnings, the record shows that Dr. Travers did not.  Rather, Dr. Travers was not retained by P&G to address the adequacy of the warnings and instructions provided by P&G.  In fact, he does not even have experience in the formulation of instructions and warnings for detergents.  Indeed, Dr. Travers testified that he had never been involved in the formulation of instructions or warnings for detergent products or dermal topical pharmaceutical products.  (Travers Dep. 40:23–41:13, ECF No. 59-2 at 3.)  Moreover, as the following excerpt shows, Dr. Travers refused to testify as to the adequacy of P&G's warnings.

Mr. Phelps: Doctor, from a dermatology and toxicology standpoint, would you agree with me that given that surfactants in chemicals in

12

> Tide Pod can – can cause a chemical burn, wouldn't a reasonable
> additional or alternate warning be something like, "You should inspect
> clothing for detergent residue and rinse residue from clothing before
> wearing clothes," something like that?
> . . .
>
> Dr. Travers: I'm not – I really can't comment about what would – an
> appropriate warning might be, or various things of human behavior.  So
> I – I'm not – that's not an area that – I mean I can't comment on what
> types of instructions should be given to people.

(Travers Dep. 40:23–41:13, ECF No. 59-2 at 3.)  Anderson's reliance on Dr. Travers's testimony to argue that an issue of material fact exists as to whether P&G's warnings were "reasonable under the circumstances" is inapt.  His attempt to massage the testimony of P&G's expert to establish this element is insufficient to create an issue of material fact.

Dr. Travers's testimony aside, the crux of Anderson's argument is that the warnings on the PODS packaging were not "strong or specific enough," *see Cook*, 913 N.E.2d at 328, and therefore P&G's lack of adequate warnings made PODS unreasonably dangerous, *see Jarrell*, 528 N.E.2d at 1166.  The Court disagrees.  At the time of Anderson's injury, the PODS packaging contained several warnings.  Relevant here, the warnings specifically stated: "if detergent gets . . . on skin, call your local Poison Control Center (or in US: 1-800-222-1222) or doctor immediately." (Vasunia Decl. ¶ 18, ECF No. 51-3 at 6.)   The instructions further provided: "[i]mmediately rinse . . . skin with water for 15 minutes."  (*Id*.)  These warnings are of "such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger."  *Jarrell*, 528 N.E.2d at 1162.  Indeed, only

one inference can be drawn from the warning label: If the detergent gets on your skin, harm may come to you—therefore, take immediate action.

One case is particularly helpful in showing P&G's warnings are adequate.  In *Weigle*, the plaintiffs were working under a semi-truck trailer supported by support stands when the stands gave way, causing the trailer to fall on the plaintiffs.  729 F.3d at 727.  The plaintiffs sued the designer of the support stands for failure to provide adequate warnings.  *Id*. at 726. The instructions at issue provided that a user should always use the support pin, which should be inserted completely through the extension tube.  *Id*. at 731.  In holding that the instructions were adequate, the Seventh Circuit stated that the designer of the stands "was not required to explain the physics of the support stands to satisfy its duty to provide adequate instructions and warnings.  Rather, it [was] enough that [the defendant] instructed users on how to use the stand properly . . .  and warned users of the inherent dangers of not following those instructions . . . ."  *Id*. at 733–34.

Here, Anderson argues that P&G's warnings are inadequate because they do not warn that PODS can cause burns to the skin or can cause cell death.  But, as to the former, as *Weigle* shows, the manufacturer need not warn of the scientific mechanism of harm.  And, as to the latter, Anderson's suggested inspection warning amounts to an instruction to consumers that, if they *completely ignore* the other posted warnings-regarding both proper use and immediate action in the event of skin exposure--they should inspect their clothes for undissolved blotches of detergent.  A warning like that would be distracting surplusage.  *See Weigle*, 729 F.3d at 733 ("Extended warnings

14

present several difficulties, first among them that, the more text must be squeezed onto the product, the smaller the type, and the less likely is the consumer to read or remember any of it. Only pithy and bold warnings can be effective.") (quoting *Todd v. Societe BIC, S.A.*, 9 F.3d 1216, 1218–19 (7th Cir. 1993) (en banc)); *see also McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 656 (7th Cir. 1998), *abrogated on other grounds by Kaiser*, 947 F.3d at 996 ("Indiana courts have expressed considerable reluctance to require ever-more detail in warnings.").  Similar to the instructions in *Weigle*, P&G's warnings instruct the consumer how to properly use PODS ("ADD PACS TO DRUM BEFORE CLOTHES") and warns consumers of the inherent dangers of not following those instructions ("if detergent gets . . . on skin, call your local Poison Control Center (or in US: 1-800-222-1222) or doctor immediately").

The Court therefore concludes as a matter of law that P&G's warnings are adequate, and that P&G did not breach its duty to warn.  P&G was not required to provide the additional warnings Anderson claims P&G should have been provided. *See Weigle*, 729 F.3d at 733 ("No additional warnings need to be furnished where such warnings would not supplement the user's understanding of the nature and characteristics of the product.").

In sum, based on the undisputed facts, Anderson has failed to establish that P&G breached its duty to provide adequate warnings.  Thus, his claim for failure to provide adequate warnings fails due to his inability to prove an essential element of the claim. *See Burt v. Makita USA, Inc.*, 212 F. Supp. 2d 893, 899 (N.D. Ind. 2002); *see also Kahrs v. Conley*, 729 N.E.2d 191, 193 (Ind. Ct. App. 2000) ("[A] defendant in a

negligence action may obtain summary judgment by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim."). Accordingly, the Court need not address Anderson's remaining arguments, and summary judgment is **granted** as to Anderson's failure to provide adequate warnings claim.

### IV.    Conclusion

For the above reasons, Defendants' Motion for Summary Judgment (ECF No. 51) is **granted**.  Final judgment will issue under separate order.

**SO ORDERED.**

Date: 6/2/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Christina Laun Fugate
ICE MILLER LLP (Indianapolis)
christina.fugate@icemiller.com

Ellen Pactor
ICE MILLER LLP (Indianapolis)
ellen.pactor@icemiller.com

Michael W. Phelps
STEWART PHELPS WOOD
mike@spwinjurylaw.com

16